# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: _____



|  |  |
|---|---|
| SCHILLER AMERICA, INC., a Florida corporation and SCHILLER, A.G., a company organized under the laws of Switzerland, | : : : : : |
| Plaintiffs. | : : |
| v. | : : |
| WELCH ALLYN, INC., a New York corporation, | : : : |
| | : : : |
| Defendant. | : |

CIVIL ACTION

**COMPLAINT**

Plaintiffs Schiller America, Inc., and Schiller, A.G., by way of Complaint against defendant Welch Allyn, Inc. say as follows:

## PARTIES

1.      Plaintiff Schiller A.G. is a privately-held company organized under the laws of Switzerland with its principal place of business at Altgasse 68, Postfach CH-6341, Baar, Switzerland.  Schiller A.G. is a manufacturer and supplier of medical equipment and devices.

2.      Plaintiff Schiller America, Inc. is a Florida corporation with its principal place of business located at 11300 N.W. 41st Street, Miami, Florida, 33178.  Schiller America, Inc., a wholly-owned subsidiary of Schiller A.G., is a supplier of medical equipment and devices.

3.      Defendant Welch Allyn, Inc. (hereinafter referred to as "Welch Allyn") is a privately-held New York corporation with a principal place of business located at 4341 State



Street Road, Skaneateles, New York, 13153. Welch Allyn is engaged in the manufacturing, sale and distribution of medical equipment and devices.

## JURISDICTION

4.      Jurisdiction for the claims asserted in Count I is proper under 28 U.S.C. §1337 because such claims arise under Section 43(a) of the Lanham Act, which is an Act of Congress regulating interstate commerce. Such claims also present a federal question for which jurisdiction is proper under 28 U.S.C. §1331.

5.      Jurisdiction for the claims asserted in Counts II through VI is invoked based on diversity of citizenship, pursuant to 28 U.S.C. §1332. The amount in controversy is greater than $75,000.00.

6.      Pendent or supplemental jurisdiction under 28 U.S.C. §1367 is proper for the state claims asserted in Count II through VI because they are so related to the claims asserted under Count I as to form part of the same case or controversy.

7.      This Court has personal jurisdiction over defendant, as defendant is engaged in commerce in this District.

2

## FACTS APPLICABLE TO ALL COUNTS

8.     Plaintiff Schiller A.G. was founded in 1974 by physicist Alfred Schiller, and today is a leading international manufacturer and supplier of computer-based Electrocardiographs, Spirometers, Patient Monitors and External Defibrillators. Schiller's international headquarters are located in Baar, Switzerland (near Zurich.) Schiller and its subsidiaries have over 400 employees worldwide and a widely-established distribution network. Schiller has earned an excellent reputation as a pioneer and innovator in the cardio-pulmonary global market.

9.     Electrocardiograph equipment ("ECG", also popularly known as "EKG") is a sophisticated, medical diagnostic system, consisting of an assembly of computer, electronic, hardware and software systems and components. ECG is used in the detection and diagnosis of heart abnormalities to measure electrical potentials on the body surface and generates a record of the electrical currents associated with heart muscle activity. Its data and information are then interpreted by physicians to help them make diagnoses and monitor their patients.

10.     A spirometer is a medical instrument used to measure the volume of air entering and leaving the lungs. "Spirometry" is the act or process of measuring the chest capacity by means of a spirometer.

11.     From approximately 1988 through the present, Schiller's wholly-owned subsidiary in the United States, plaintiff Schiller America, Inc. (hereinafter collectively referred to as "Schiller"), has sold Schiller ECG and spirometry equipment in the United States. Since 2001, Schiller America's headquarters have been located in Miami, Florida.

12.    Schiller's medical equipment is marketed and sold to its customers primarily through non-exclusive, medical supply distributors in the United States who, in turn, sell the equipment to primary care customers (physicians, physician groups and physician practices) across the country.  Schiller also engages in direct sales to these customers.  Although Schiller also sells products to acute care customers (e.g. hospitals), the primary care market is, and has always been, the core market for Schiller in the United States.

13.    Schiller's international reputation has inspired confidence in physicians for almost 30 years, providing quality products and leading-edge technology.  In fact, this reputation has propelled Schiller to be one of the worldwide market leaders in the cardiac diagnostic physician-based markets.

14.    From approximately 1988 through 1998, Schiller sold ECG equipment in the United States either directly or through non-exclusive distributors.  Schiller enjoyed a prominent reputation in the European market, and it was Schiller's goal to become an important manufacturer for the physician market in the United States and compete directly with Cardiac Science Corporation, maker of Burdick ECG systems ("Burdick"), which had and continues to have the largest share of the U.S. market.

15.    In 1998, defendant Welch Allyn, although a much larger company than Schiller with a wide range of medical equipment devices and large distribution network in the United States, never designed and manufactured its own line of ECG equipment.

16.    However, upon information and belief, Welch Allyn intended all along to become the dominant force and player in the primary care ECG market in the United States (seeking to replace its competitor Burdick.)  In accordance with this strategy, Welch Allyn decided to become an exclusive distributor of Schiller in the United States to establish its own presence in

the marketplace, design and launch its own products and later replace and squeeze Schiller out of the United States market.

17.     Unfortunately and to its great detriment, Schiller did not discover this until much later, as set forth below.

18.     Defendant Welch Allyn served as Schiller's North American exclusive distributor from approximately January 1, 1998 through October 1, 2003.

19.     On or about January 1, 1998, Schiller and defendant Welch Allyn entered into a "Distribution and Supply Agreement" (the "1998 Agreement"), wherein Welch Allyn agreed to serve as the exclusive distributor of Schiller's ECG equipment in the United States and Canada. The 1998 Agreement had a term of five years.

20.     Pursuant to the 1998 agreement, the parties agreed that all of the ECG equipment which Schiller had been selling in North America would now be co-branded by Schiller and Welch-Allyn and distributed to customers through Welch Allyn's distribution channels. Thus, although the equipment was 100% designed, engineered and manufactured by Schiller, it would bear both companies' trademarks and logos. However, Schiller maintained all rights to its patents, copyrights, trade secrets, software and other proprietary information associated with the co-branded equipment.

21.     Because of the exclusive relationship between the parties, customers could only purchase Schiller's ECG equipment through Welch Allyn's distribution representatives. In turn, Welch Allyn was prohibited from selling competing products in North America, with the exception of certain products sold by Welch Allyn at the time of the execution of the 1998 Agreement.

22.     Schiller and Welch Allyn operated under the 1998 Agreement until it expired on December 31, 2002.  During this period, Welch Allyn acquired, and Schiller confidentially shared with Welch Allyn, significant confidential, proprietary and trade secret information, documents and data, particularly with respect to sales and marketing, pricing, technical development, market strategy and many other areas.  This included the preparation, planning, development, strategy and launching of an innovative and versatile Schiller ECG equipment called the AT-102 (an ECG equipment with more communication and upgrade features than any other previous Schiller ECG equipment sold in the United States).

23.     Schiller was unaware that its special and exclusive relationship with Welch Allyn, and the significant confidential information, documents, data and strategies were being used by Welch Allyn to seed the United States market with a Welch Allyn presence and to eventually abandon and sabotage its relationship with Schiller.  Welch Allyn's ultimate purpose all along was to design and roll out its own competing line of ECG products using technology and trade dress very similar to Schiller's, and squeeze Schiller out of the marketplace through unfair competition tactics and disparaging Schiller's products, as set forth below.

24.     On or about January 1, 2003, the parties entered into a "Restated Distribution and Supply Agreement" (the "January 2003 Agreement"). The January 2003 Agreement again named Welch Allyn as Schiller's exclusive North American distributor and had an initial term of two years, with an automatic renewal clause for another two-year term.

25.     A short time after entering into the January 2003 Agreement, Schiller learned through third parties that Welch Allyn was acquiring Cardio Control NV, one of Schiller's direct competitors in the European ECG market.  It was clear to Schiller that Welch Allyn had been negotiating the acquisition of Cardio Control NV during the term of the 1998 Agreement, upon

information and belief, in 2002, with a view towards using Cardio Control's "interpretation algorithm" and its workstation software to use in Welch Allyn 's own and future line of products (which were going to directly compete with Schiller). Welch Allyn ultimately acquired those companies and their respective technologies against Schiller's strenuous objection.

26.     By letter dated January 20, 2003, Schiller terminated the January 2003 Agreement and informed Welch Allyn that the acquisition of Cardio Control NV and its competitive conduct constituted a material breach of the agreement, and a sudden, unannounced "frontal attack" against Schiller.

27.     Welch Allyn persuaded Schiller to allow it to remain as a non-exclusive distributor for the remainder of 2003. As a result, on or about March 17, 2003, the parties entered into a "Restated Distribution and Supply Agreement" (the "March 2003 Agreement"), which provided for the transition of Welch Allyn's status as an exclusive distributor of Schiller's ECG equipment to a non-exclusive distributor. The March 2003 Agreement had an expiration date of December 31, 2003.

28.     In the meantime, during the term of the January and March 2003 agreements, Welch Allyn continued and accelerated its plan and efforts to immediately and directly compete with Schiller and squeeze Schiller out of the physician-based ECG market in the United States.

29.     For example, although the March 2003 agreement with Schiller was in full force and effect, Welch Allyn told its distributors and sales representatives that as a result of certain acquisitions by Welch Allyn, Welch Allyn and Schiller had agreed to end their relationship by October 2003-- a statement that was false, as the agreement was bound to expire on December 31, 2003 (and even then, the agreement obligated Welch Allyn to service and maintain the Schiller- Welch Allyn co-branded equipment for 5 years after December 31, 2003). Schiller

believes that during this time, Welch Allyn engaged in an effort to "strong arm" distributors into not purchasing Schiller products, a campaign which Schiller believes continues to this day.

30.    In August 2003, Welch Allyn also told its distributors and sales reps that Welch Allyn (in conjunction with newly-acquired Cardio Control NV) had manufactured a "new ECG device", demos of which were being sent by Welch Allyn to each of the distributor representatives. Further, it forecasted the release of other new Welch Allyn ECG equipment later in 2004.

31.    Thus, during the term of these 2003 agreements, Welch Allyn was busily, behind the scenes, preparing the launch of a set of certain ECG equipment to tide it over until it could launch the Schiller-look-alike CP-100 and CP-200 flagship line which Welch Allyn eventually launched in late 2005.

32.    This "stopgap" equipment to compete with Schiller's was the CP-10, the CP-20, and the PC-based systems called PCR 100i, PCR 100 and PCR 104 (all made possible by Welch Allyn's previous acquisition of Cardio Control which Schiller had objected to). These machines were launched by Welch Allyn in December 2003 to compete head-to-head with its now former ally, Schiller.

33.    Upon information and belief, while this stopgap line was being launched, Welch Allyn continued using the confidential, detailed and comprehensive documents, data and information which Schiller had previously shared with it in order to develop the Welch Allyn flagship line which would directly attack Schiller's flagship, new AT-102 equipment. In other words, Welch Allyn became an ally of Schiller for several years to use Schiller's excellent name and reputation, and learn Schiller technology and business strategies, in order to later compete

with and replace Schiller, leaving Burdick and Welch Allyn as the sole dominant players of the primary care, physician-based market.

34.    In response to Welch Allyn's egregious and bad faith conduct, Schiller considered the March 2003 agreement as having been breached and terminated by Welch Allyn as of September 2003. On or about September 25, 2003, Schiller wrote a letter to Welch Allyn in which Schiller stated its position that the March 2003 agreement, and the previous agreements, had been breached by Welch Allyn. Thus, the manufacturer-distributor relationship between Schiller and Welch Allyn ended at that time.

35.    Pursuant to the terms of the March 2003 Agreement, however, Schiller believed it was obligated thereunder to continue using Welch Allyn to serve as an authorized service provider to perform warranty and service repairs on the co-branded equipment sold by and through Welch Allyn in the United States. As such, it coordinated the logistics of service and maintenance with Welch Allyn.

36.    Instead, Welch Allyn saw its post-termination obligations under the March 2003 agreement as an excellent vehicle to approach all of the customers who had the co-branded machines (and who knew these machines were Schiller units) to disparage Schiller's name and products and aggressively and unfairly introduce its new CP-100 and CP-200 flagship lines. This involved the very customers it had sold equipment to wearing the hat of a Schiller-authorized distributor. From September 25, 2003 through the present, Schiller has been selling its ECG and spirometry equipment through non-exclusive distributors and directly to primary care customers.

37.    In or about late September or early October 2005, Welch Allyn launched its CP-100 and CP-200 lines.  Welch Allyn started taking orders, but apparently due to technical problems with the machines, it did not start delivering them to customers until early 2006.

38.    However, in or about November 2005, Schiller became aware that Welch Allyn had launched a promotional scheme directed at Schiller's distributor representatives, major national accounts and ultimately, Schiller's United States customer base.  The promotion was labeled as the "Normandy Promotion Buy-in" (hereinafter referred to as the "Normandy Promotion").  The "Normandy" name apparently refers to the Allied Normandy invasion of Europe launched on June 6, 1944, probably a metaphor for Welch Allyn's "invasion" of a certain European's company's ECG market in the U.S.

39.    At the center of the Normandy Promotion was a "Welch Allyn/Schiller trade-in program", wherein Welch Allyn customers were offered a ½ price discount on Welch Allyn's new competing line of ECG equipment with the trade-in of Schiller's co-branded ECG equipment.

40.    The promotion also contained the following disparaging language: "Why trade your unit in?  *Because many doctors are looking for an ecg that can go paperless, and the Schiller units do not have emr connectivity at this point.*"  A copy of the Normandy Promotion is attached hereto as Exhibit A.

EMR stands for "electronic medical record," which is a digitized version of a patient medical record system or chart. The term EMR more recently has changed to "EHR" (Electronic Health Record).  (For ease of reference, we will refer to this technology as "EMR").

A typical EMR system can provide access to patient data by medical and clinical staff at any given location, enable accurate and complete claims processing by insurance companies, build automated checks for drug and allergy interactions, keep clinical notes, prescriptions and scheduling, and facilitate the communication of patient information sent to and reviewed by physicians and laboratories. The term "EMR" has expanded to include systems which keep track of other relevant medical information. "EMR connectivity" refers to the ability of a medical device such as an ECG to report, convey, communicate and transfer its technical data to an EMR system.

41.     In addition to the above, upon information and belief, Welch Allyn also engaged in other verbal and written communications similarly disparaging Schiller's units, name and reputation.  Upon information and belief, it also appears that Welch Allyn has made special arrangements with the major EMR software vendors (who write a "bridge software" allowing an ECG to exchange data with an EMR system) for the purpose of developing EMR interface software for its machines.

42.     Welch Allyn's statements made in or regarding the Normandy Promotion (verbal and/or written) that "Schiller's units do not have emr connectivity at this point" is a false statement.  Welch Allyn knowingly made these false and misleading commercial statements in order to create the false and misleading impression that Schiller's ECG units, (whether those co-branded or Schiller's units in general), are antiquated, outdated, useless, inconvenient and lacking a component which is an increasingly important feature.  In fact, in a press release dated October 26, 2005, introducing the CP-100 and CP-200 line, Welch Allyn stated that "[r]ecent research conducted by the American Association of Family Physicians (AAFP) shows that between 25 and 30 percent of family physicians currently use EMRs in their practices. That same

survey also concluded that over the next year, more than 50 percent of the remaining non-users plan to implement EMRs into their workplaces - meaning doctors will increasingly be in need of devices that have the ability to connect to these systems."

43.    Thus, Welch Allyn's false and misleading statements about Schiller's units' EMR connectivity capabilities were calculated to address a critical component which physicians are increasingly looking for in purchasing an ECG system.

44.    This type of sophisticated medical equipment is expensive, with units selling for approximately $3,000 to $ 7,500. Once a physician decides to purchase one of these machines, the company which has sold the equipment is now "entrenched" and in an excellent position to retain that customer for years to come. The machines need to be serviced, and accessories are typically sold for them on an annual basis. Ownership of the same machine by a single customer can last an average of 7-10 years. Thus, once a sale is made, it is difficult for a competitor to persuade a customer to purchase a replacement, new machine for several years.

45.    As a result of Welch Allyn's wrongful conduct, Schiller has suffered harm, including, but not limited to, reduction in number of units sold and damage to its goodwill and reputation. Defendant Welch Allyn, as of the date of filing of this Complaint continues implementing and executing the Normandy promotion and the wrongful conduct described herein.

**COUNT I**
**VIOLATIONS OF SECTION 43(a) OF THE FEDERAL LANHAM ACT**

46.    Schiller repeats and incorporates by reference the statements and allegations in paragraphs 1-45 of the Complaint as though fully set forth herein.

47.    Defendant Welch Allyn's conduct, described herein, constitutes false advertising, product disparagement and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

48.    Defendant Welch Allyn's commercial statements, made through and in the context of interstate commerce, to distributors, sales representatives, customers and/or members of the public or the ECG and/or Spirometry market that *"the Schiller units do not have emr connectivity at this point,"* or similar statements, including statements made in connection with the Normandy promotion, create the false and misleading impression that Schiller's ECG units, (whether those co-branded or Schiller's units in general), are antiquated, outdated, useless, inconvenient and lacking a component which is an increasingly important feature for physicians and healthcare professionals and institutions purchasing this equipment.

49.    Defendant Welch Allyn's false and misleading statements, described above, have misled and have the tendency to mislead customers about Schiller's products.

50.    Defendant Welch Allyn's false and misleading statements are material because they are likely to, and have adversely affected, consumers' decisions to purchase Schiller's products.

51.    Defendant Welch Allyn's false and misleading statements are willful and reckless because Defendant knew or should have known that the statements made were false, and they

were intended to deceive, mislead and confuse the parties hearing and/or reading the statements about the nature, quality, versatility, usefulness and reliability of Schiller's products.

52.     Schiller has suffered actual economic injury, including loss of sales and irreparable injury to its goodwill and reputation as a direct and proximate result of defendant Welch Allyn's false and misleading statements and violations of the Lanham Act.

53.     Defendant Welch Allyn's conduct is continuing and will continue unless restrained by the Court. Unless defendant is enjoined from engaging in its wrongful conduct, Schiller will continue to suffer irreparable injury and harm.

**COUNT II**
**PRODUCT DISPARAGEMENT IN VIOLATION OF FLORIDA COMMON LAW**

54.     Schiller repeats and incorporates by reference the statements and allegations in paragraphs 1-45 of the Complaint as though fully set forth herein.

55.     Defendant Welch Allyn's false and misleading statements, described herein, constitute product disparagement in violation of Florida common law.

56.     Defendant Welch Allyn's false and misleading statements have misled and have the tendency to mislead customers about Schiller's products.

57.     Defendant Welch Allyn's false and misleading statements constitute willful and deliberate efforts to cause consumers to refrain from purchasing Schiller's Products.

58.     Defendant Welch Allyn's false and misleading statements have caused Schiller to lose sales and customers, and have caused Schiller actual economic injury and irreparable injury to its goodwill and reputation.

59.     Defendant Welch Allyn's conduct is continuing and will continue unless restrained by the Court. Unless defendant is enjoined from engaging in its wrongful conduct, Schiller will continue to suffer irreparable injury and harm.

## COUNT III
## UNFAIR COMPETITION IN VIOLATION OF FLORIDA COMMON LAW

60.    Schiller repeats and incorporates by reference the statements and allegations in paragraphs 1-45 of the Complaint as though fully set forth herein.

61.    Defendant Welch Allyn's false and misleading statements and other wrongful conduct, described herein, constitute unfair competition in violation of Florida common law.

62.    Defendant Welch Allyn's false and misleading statements have misled and have the tendency to mislead customers about Schiller's Products.

63.    Defendant Welch Allyn's false and misleading statements and other wrongful conduct described herein constitute willful and deliberate efforts to cause consumers to refrain from purchasing Schiller's products.

64.    Defendant Welch Allyn's false and misleading statements and other wrongful conduct have caused Schiller to lose sales and customers, and have caused Schiller actual economic injury and irreparable injury to its goodwill and reputation.

65.    Defendant Welch Allyn's conduct is continuing and will continue unless restrained by the Court. Unless defendant is enjoined from engaging in its wrongful conduct, Schiller will continue to suffer irreparable injury and harm.

## COUNT IV
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS IN VIOLATION OF FLORIDA COMMON LAW

66.    Schiller repeats and incorporates by reference the statements and allegations in paragraphs 1-45 of the Complaint as though fully set forth herein.

67.    Defendant Welch Allyn's statements, described herein, are knowingly false and defamatory statements about Schiller, Schiller's business and Schiller's products.

68.    Defendant has intentionally and maliciously made such false statements to cause injury to Schiller and to Schiller's goodwill, reputation and business.

69.    Defendant Welch Allyn's knowingly false, misleading and disparaging statements are causing distributors and/or customers to believe that Schiller's products are antiquated, outdated, useless, inconvenient and lacking a component which is an increasingly important feature for physicians and healthcare professionals and institutions purchasing this equipment.

70.    Defendant Welch Allyn is well aware that Schiller has important business relationships with national, regional and local distributors, physicians and physician groups and practices and hospitals, all involved in the sale, distribution, purchase and advertisement of ECG and Spirometry equipment.

71.    Defendant Welch Allyn has intentionally and unjustifiably interfered with the business relationships between Schiller and those parties by making knowingly false and misleading statements regarding Schiller and Schiller's products.

72.    Defendant Welch Allyn's conduct is causing irreparable injury to Schiller's business relationships with its distributors and customers, as well as to Schiller's goodwill and reputation.

73.    Schiller has lost sales and customers as a direct and proximate result of defendant Welch Allyn's knowingly false and misleading statements.    With respect to co-branded equipment that was traded in by customers under the Normandy Promotion, for example, Schiller has lost sales of replacement parts, supplies and accessories.

74.    Defendant Welch Allyn's conduct is continuing and will continue unless restrained by the Court. Unless defendant is enjoined from engaging in its wrongful conduct, Schiller will continue to suffer irreparable injury and harm.

**COUNT V**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS IN VIOLATION OF FLORIDA COMMON LAW**

75.    Schiller repeats and incorporates by reference the statements and allegations in paragraphs 1-45 of the Complaint as though fully set forth herein.

76.    Defendant Welch Allyn's statements, described herein, are knowingly false and defamatory statements about Schiller, Schiller's business and Schiller's products.

77.    Defendant has intentionally and maliciously made such false statements to cause injury to Schiller and to Schiller's goodwill, reputation and business.

78.    Defendant Welch Allyn's knowingly false, misleading and disparaging statements are causing distributors and/or customers to believe that Schiller's products are antiquated, outdated, useless, inconvenient and lacking a component which is an increasingly important feature for physicians and healthcare professionals and institutions purchasing this equipment.

79.    Defendant Welch Allyn is well aware that Schiller is developing and/or intends to develop, a business relationship, with prospective national, regional and local distributors, physicians and physician groups and practices and hospitals, all involved in the sale, distribution, purchase and advertisement of ECG and Spirometry equipment.

80.    Defendant Welch Allyn has intentionally and unjustifiably interfered with the business relationships between Schiller and those parties by making knowingly false and misleading statements regarding Schiller and Schiller's products.

81.    Defendant Welch Allyn's conduct is causing irreparable injury to Schiller's business relationships with its distributors and customers, as well as to Schiller's goodwill and reputation.

82.    Schiller has lost sales and customers as a direct and proximate result of defendant Welch Allyn's knowingly false and misleading statements.    With respect to co-branded equipment that was traded in by customers under the Normandy Promotion, for example, Schiller has lost sales of replacement parts, supplies and accessories.

83.    Defendant Welch Allyn's conduct is continuing and will continue unless restrained by the Court. Unless defendant is enjoined from engaging in its wrongful conduct, Schiller will continue to suffer irreparable injury and harm.

**COUNT VI**
**SLANDER IN VIOLATION OF FLORIDA COMMON LAW**

84.    Schiller repeats and incorporates by reference the statements and allegations in paragraphs 1-45 of the Complaint as though fully set forth herein.

85.    Defendant Welch Allyn's statements, described herein, are knowingly false, misleading and defamatory statements about Schiller and Schiller's Products.

86.    Defendant Welch Allyn has intentionally and maliciously uttered the statements described herein solely to cause injury to Schiller and Schiller's business.

87.    Defendant Welch Allyn's knowingly false, misleading and disparaging statements are causing the public to believe that Schiller's products are antiquated, outdated, useless, inconvenient and lacking a component which is an increasingly important feature for physicians and healthcare professionals and institutions purchasing this equipment.

88.    Defendant Welch Allyn's conduct is causing irreparable injury to Schiller's business relationships with its customers, as well as to Schiller's goodwill and reputation.

89.    Schiller has lost sales and customers as a direct and proximate result of Defendant Welch Allyn's knowingly false, misleading, defamatory and slanderous statements.

90.    Defendant Welch Allyn's conduct is continuing and will continue unless restrained by the Court. Unless defendant is enjoined from engaging in its wrongful conduct, Schiller will continue to suffer irreparable injury and harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs Schiller America, Inc. and Schiller A.G. request that this Court grant the following relief:

A.    A permanent injunction enjoining defendant Welch Allyn, its officers, agents, directors, employees, attorneys, representatives, affiliates, subsidiaries, servants, successors and assigns, and all those persons in active concert or participation with any of them or acting on their behalf, from the following acts:

(1)    Executing, implementing, disseminating, communicating or carrying out the Normandy promotion or similar promotion;

(2)    Making any false, misleading, slanderous, defamatory, or disparaging statements or engaging in false, misleading or unfair trade practices or tortious interference with business relationships, including, without limitation, stating, claiming, suggesting, intimating or implying in any manner whatsoever that Schiller's products do not have EMR connectivity or any other disparaging comment about Schiller's products;

(3)    Making any other false, misleading, slanderous, disparaging or defamatory statements about Schiller or Schiller's products; and

(4)    Otherwise engaging in acts, either directly or through other entities, of false advertising, product disparagement, slander, unfair and deceptive trade practices, unfair competition, or tortious interference with actual or prospective business relations.

B.    An Order requiring defendant Welch Allyn to immediately place a corrective advertisement in a form, frequency, manner and publications that are acceptable to Schiller and the Court that expressly (i) notifies the public that Schiller's products have EMR connectivity and (ii) apologizes for defendant's unlawful conduct;

C.    An Order requiring defendant Welch Allyn to notify, in a form and manner that is acceptable to Schiller and the Court, the recipients of its false and misleading advertising and slanderous, and defamatory statements that Schiller's products have EMR connectivity and apologize for defendant's unlawful conduct;

D.    An Order requiring defendant Welch Allyn to file with the Court and serve upon Schiller, within thirty (30) days after the entry of such order, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the injunction, including, without limitation, the specific measures that were taken to ensure that (i) defendant's, salespersons, agents and employees have actual knowledge of the injunction and that said persons are in full compliance with the injunction, (ii) the unlawful conduct that is the basis for this Complaint does not continue to occur, and (iii) the remedial action that was taken against the officers, salespersons, agents and/or employees on account of defendant's unlawful conduct;

E.    Compensatory and monetary damages, including, but not limited to, a monetary award to Schiller for corrective advertising;

F.    Punitive damages;

G.    Prejudgment and post-judgment interest;

H.    Schiller's costs and expenses, including, without limitation, Schiller's reasonable attorneys' fees and expert's fees; and

I.    All such other and further relief, in law or in equity, to which Schiller may be entitled or which the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Schiller demands a trial by jury of all issues so triable in this action.

**SHUTTS & BOWEN LLP**
Attorneys for Plaintiffs
Schiller America, Inc. and Schiller, A.G.
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
(305) 358-6300 Telephone
(305) 347-7873 Facsimile

By: _____
        Jonathan Cohen, Esq.
        Florida Bar No.: 384305


**Of Counsel:**

**NORRIS, McLAUGHLIN & MARCUS**
Attorneys for Plaintiffs Schiller America, Inc.
and Schiller A.G.
721 Route 202-206
Bridgewater, N.J. 08807
(908) 722-0700 Telephone
(908) 722-0755 Facsimile

Dated:   June 6, 2006

MIADOCS 937713 2

**EXHIBIT "A"**

*PSS*
# Normandy Promotion Buy-in

## Special Pricing

| Product | Normal Cost | PSS Cost |
|---|---|---|
| **CP-100i** <br> *3-channel interpretive* | $3,115 | $2,225 |
| **CP-200i** <br> *3-channel interpretive with color preview screen* | $3,815 | $3,065 |

## Special Combo ECG/Spiro Promotion
*Buy a CP-200i combo and get free spirometry.*

| | | |
|---|---|---|
| **CP-200i w/spiro** <br> *3-channel interpretive with color screen & free spirometry* | $5,040 | $3,815\*\*\* |

***Note:** The CP-200i with free spirometry is part of a national program, thereby allowing all authorized Welch Allyn dealers to participate on an equal playing field. The CP-100 and CP-200 listed above represent special costs on this one-time buy-in.*

*Above pricing on CP-100i and CP-200i is on a first-come-first-serve basis. The above pricing on CP-200i combo w/spirometry is good through December 31, 2005.*

## INVENTORY ON INITIAL BUY-IN:

CP-100i..............................................10 each
CP-200i combo w/spirometry..............5 each

*Note: once inventory is depleted, I will keep you informed of any future buy-in, and the special dealer costs associated with it.*

## Get 50% off on a Welch Allyn SpiroPerfect Spirometer

*when you purchase any PC-based cardiopulmonary device listed below:*

> *PC-based resting ecg*
> *PC-based exercise stress system*
> *Ambulatory blood pressure monitor*

### Dealer cost of the spirometer will only be $597!!!

*SpiroPerfect is the new PC based spirometer that just came out.*

*Note: this offer is part of a national program, thereby allowing all authorized Welch Allyn dealers to participate on an equal playing field.*

---

# Welch Allyn/Schiller trade-in program

**Any Welch Allyn customer can purchase a CP-100, CP-200, or CP-200 combo for ½ price with the trade-in of a Welch Allyn Schiller ecg:**

(50% off is computed against normal dealer margin)
(Dealer margin limited to 20%)

| | | |
|---|---|---|
| CP-100 | $1725 | $1380 |
| CP-100i | $2225 | $1780 |
| CP-200 | $2225 | $1780 |
| CP-200i | $2725 | $2180 |
| CP-200 w/ spire | $3100 | $2480 |
| CP-200i w/spiro | $3600 | $2880 |

**NOTE:** *The "i" at the end represents an interpretive unit. Please note that 99% of all ecg's sold are interpretive units. If the doctor had an interpretive ecg before, it is almost certain that this what he wants again.*

**Why trade your unit in?** *Because many doctors are looking for an ecg that can go paperless, and the Schiller units do not have any emr connectivity at this point.*

**Caution:** *The Schiller unit you trade-in must say "Welch Allyn" on it to qualify for the trade-in program.*

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
SCHILLER AMERICA INC, A FLA. CORP

## DEFENDANTS
WELCH ALLYN, INC A NEW YORK CORP

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ___ NEW YORK
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
JONATHAN COHEN, ESQ
SHUTTS & BOWEN
1500 MIAMI CENTER
MIAMI FL 33131  DADE06C  21439  Lener / Klein

Attorneys (If Known)

(d) Check County Where Action Arose:  ☒ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☒ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):
a) Re-filed Case ☐ YES ☐ NO    b) Related Cases ☐ YES ☐ NO
JUDGE  SECTION 43 (A)    DOCKET NUMBER

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
SECTION 43(A) OF THE LANDHAM ACT

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 75,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
Cohen

DATE
6-6-06

FOR OFFICE USE ONLY

AMOUNT 250.00   RECEIPT # 74145